[No. 22940. Department Two. April 6, 1931.]

S. H. HAMILTON *et al., Respondents,* v. OHIO FARMERS INSURANCE COMPANY, *Appellant.*[1]

*C. F. Wallace,* for appellant.

*LeRoy McCann,* for respondents.

[1]Reported in 297 Pac. 784.

TOLMAN, C. J.—This is an action on a policy of insurance, which was tried to the court sitting without a jury, in which findings of fact and conclusions of law favorable to the plaintiffs were made, followed by a judgment based thereon for the full amount demanded. Defendant has appealed from that judgment.

The first error assigned is based upon the admission in evidence of the policy of insurance sued upon, which by its terms insures "R. H. Hamilton, doing business as the Hamilton Auto Freight." The undisputed evidence upon this subject given by one of the plaintiffs is:

"Q. (Mr. McCann): What did you tell the agent [the agent for the appellant insurance company]? A. I called him up and told him I had just got a lot of glass on the truck for Wenatchee, and oil, and I said: 'It isn't our truck, it is R. H. Hamilton's, my brother's, truck, but I have the numbers of the truck, and everything, here, and we have to have that insured because it is quite an item and I can't afford to take a chance, and on this one particular load I just want a trip insurance on this,' and I give him the truck number, and the oil and the glass, and told him just for the one trip—that I wanted it as before, because I had been taking insurance out from time to time on other trucks on particular occasions when we would be rushed with other matters and would hire them, and he said, 'All right,' and gave me the insurance as R. H. Hamilton's truck. Of course I told him it was his truck but absolutely our load, and I wanted the insurance for that trip. Q. Who paid for the insurance? A. We did."

It seems clear that this was sufficient to warrant the ruling permitting the amendment of the complaint so as to justify a prayer for reformation of the policy and the admission of the policy in evidence; also this was sufficient, as between the parties, to support the judgment. But the fact remains that R. H. Hamilton was not made a party to the action, and was not bound

by the testimony above quoted; and the judgment here would be no bar to any action he might bring on the policy. The court should have ordered that he be made a party, but we think now the same result can be accomplished by permitting R. H. Hamilton to execute and file a written waiver of any right in, or claim under, the policy.

■ It is next urged that there was no sufficient proof of loss, and no sufficient evidence, to warrant any recovery on the policy. The policy of insurance covered one certain and definite shipment of glass and other merchandise while on board motor truck, among other things, against loss or damage caused by:

"B. Collision of the motor truck with any other motor truck, vehicle or object, excluding any loss or damage caused by coming in contact with any portion of the roadbed or by striking the rails or ties of street, steam or electric railroad, or any damage caused by coming in contact with a stationary object in backing for loading or unloading purposes."

It was shown quite definitely that the crated glass was properly and securely loaded on the truck at the place of business of a reputable jobber in the city of Seattle, under the supervision and inspection of those skilled in such matters; that the truck proceeded at once from the point of loading to Wenatchee, meeting with no untoward incident except the following, as testified to by the driver of the truck:

"Q. Well, now, when you got to Cashmere, state what happened. A. When I came into Cashmere I turned down this way, like that, and made the left turn across the railway track. As I made the right turn to go into Cashmere I met a car, and instead of him going around the turn like he should he cut corners, and I pulled out to keep from hitting him and went over the curb. Then I straightened up and stopped, and discovered that my front chain tackle was loose. Then I tightened the chain and came on to Wenatchee. Q.

About how high is the curb? A. About eight inches. Q. It is on the corner in front of the bank, and by the oil station. A. Yes. Q. It is the first turn you make to the right after crossing the railway track? A. Yes, sir. Q. When you observed your load at that time, what did you find? A. I found my chain tackle was loose. Q. Which one? A. The front one. Q. What did you do then? A. I tightened it up. Q. How fast were you going when you hit that curb, would you say? A. Probably fifteen. I put on my brakes as quick as I could. Q. Was it a severe jolt? A. Yes, it was a pretty good jolt. Q. Did you report that to the Hamilton Auto Freight Company immediately? A. Yes, I told them— Q. I mean, when you got in with the load. A. I told them that I had run over the curb, and that the chain was loose and I tightened it up. It showed no effects of broken glass right then. I couldn't tell, you see. I didn't take the boards off the cases, or anything, to look at it. Q. Were these solid cases? A. Yes, sir.''

On arrival in Wenatchee, the glass was carefully unloaded by skilled workmen, and some two or three days later, on opening the crates, the glass was found to be cracked and shattered to the extent of the recovery here claimed. It was shown that the glass was in the original crates in which it had been shipped from Germany to Seattle, and there was direct testimony by those who claimed to have actual knowledge that the Seattle jobber, as a custom and for his own protection, always sufficiently opened and examined all such crates when received from the ocean carrier, in order to determine whether breakage had occurred in transit which should be charged against the carrier. True, no witness was produced who testified that this particular crate had been so opened and examined; but, we think, the custom being shown, and the strong reason why the jobber for his own protection would comply therewith also appearing, that was sufficient to make a *prima facie* case; and, in the absence of any

testimony to the contrary, it is sufficient to sustain the trial court's finding that the glass was broken by running the truck over the curb at Cashmere. A fair outline of this situation was detailed in the proof of loss furnished, and, in the absence of some specific objection, we think that was sufficient.

■ Was what occurred at Cashmere a collision within the meaning of the policy? The roadbed, as that term is used in the policy, necessarily means that part of the road intended to be used in vehicular traffic. The curb was outside of, and no part of, that roadbed. It was certainly an object. The truck collided with it, and we think the following authorities amply support the view that the collision with the curb was a collision with an object within the terms of the policy. *Kliant v. Providential Assurance Co.*, 63 Quebec Official Law Reports (Superior Court) 7; *Schussler v. Fort Dearborn Casualty Underwriters*, 230 Ill. App. 581; *Interstate Casualty Co. v. Stewart*, 208 Ala. 377, 94 South. 345; *Yorkshire Insurance Co. v. Bunch-Morrow Motor Co.*, 212 Ala. 588, 103 South. 670; *Stix v. Travelers' Indemnity Co. of Hartford*, 175 Mo. App. 171, 157 S. W. 870; *Rouse v. St. Paul Fire & Marine Ins. Co.*, 203 Mo. App. 603, 219 S. W. 688.

Appellant cites but one case to the contrary—*Wettengel v. United States "Lloyds"*, 157 Wis. 433, 147 N. W. 360—but when the facts of that case are considered and understood, we think it has no controlling force here.

If, within thirty days from the going down of the remittitur, a written waiver of any right in, or claim under, the policy, duly executed by R. H. Hamilton, be filed, the judgment will stand affirmed. Otherwise, a new trial will be granted, and the plaintiff be required to bring in R. H. Hamilton as a party, in order that he be bound by the judgment finally entered.

The advantage gained by the appellant on this appeal being purely a technical one, neither party will recover costs in this court.

FULLERTON, BEALS, MILLARD, and BEELER, JJ., concur.